## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| **TOXI E. CADE** | |
| **Plaintiff/Relator,** | |
| **v.** | **1:09-cv-3522-WSD** |
| **PROGRESSIVE COMMUNITY HEALTHCARE, INC., FRIENDSHIP COMMUNITY HEALTHCARE, INC., JAMES CHAMBERS, DR. MICHAEL BROOKS, DR. CARISA HINES, DR. HAROLD MINERVE, and LOLITA RHONE,** | |
| **Defendants.** | |

## OPINION AND ORDER

This matter is before the Court on Defendants Progressive Community

Healthcare, Inc. ("PCHC") and James Chambers' ("Chambers") (collectively,

"Defendants") Motion to Dismiss [15].

## I.   BACKGROUND

Relator Toxi E. Cade ("Cade" or "Relator") brings this *qui tam* action on

behalf of the United States and the State of Georgia, alleging that the defendants

knowingly presented or caused to be presented to the United States and Georgia

false claims for payment or approval.[1]  PCHC is a Georgia corporation, and a Medicare Part B and Medicaid provider.  (Am. Compl. ¶¶ 6, 12).  Chambers owns and runs PCHC, which was established in March 2006.  (Id. ¶¶ 5-6).  After PCHC was created, the employees and patients of Defendant Friendship Community Healthcare, Inc. ("FCHC") were transferred to PCHC.  (Id. ¶¶ 5-6, 22).[2]

From August 22, 2005, until March 2006, FCHC employed Cade as a part-time front-desk clerk.  (Am. Compl. ¶ 5).  The Complaint does not make any allegations about Cade's duties in this job.  From March 2006 until her termination on April 16, 2008, Cade worked at PCHC as a "Clinical Coordinator Office Assistant."  (Id.).  As an office assistant, Cade had "responsibility for maintaining FCHC's and PCHC's patient databases and faxing claims ('Encounter Forms'/'Superbills') to a company called MedSpec."  (Id.).  Cade would also "audit the claim submission[s], based upon a report received from the billing company, MedSpec."  (Id. ¶ 15).

---

[1] Friendship Community Healthcare, Inc., Dr. Michael Brooks, Dr. Carisa Hines, Dr. Harold Minerve, and Lolita Rhone have not been served with the Summons and Complaint.

[2] It is unclear from the Complaint whether or in what capacity FCHC continued to operate after the creation of and transfer of patients to PCHC.  The website of the Georgia Secretary of State, however, indicates that FCHC was administratively dissolved on September 11, 2010.  See Ga. Sec'y of State, Corporation Search, http:// corp.sos.state.ga.us/corp/soskb/CSearch.asp (visited June 17, 2011).

According to the Complaint, the billing process began when either Chambers, another physician assistant, a medical assistant, or a registered nurse practitioner visited patients in the office or in their homes.  (Am. Compl. ¶¶ 15, 17).  For each visit with a patient, the provider would complete a form known as an Encounter Form or Superbill.  The Encounter Form contains preprinted Current Procedural Terminology ("CPT") codes—which indicate the service or procedure provided to a patient—and diagnosis codes—which specify the disease or medical condition observed by the provider.  (Id. ¶¶ 9-10, 15).  These forms, in turn, were "faxed to a billing company known as MedSpecialists ('MedSpec')."  (Id. ¶ 15).  It is unclear what happened next, but the Complaint says that "Relator would audit the claim submission, based upon a report received from the billing company, MedSpec, for resubmission to Medicare and Medicaid."  (Id.).  If the form required additional information, the office staff was "instructed to ask Mr. Chambers and in his absence, was to check the patient records."  (Id.).

The Complaint lists different practices by Defendants that allegedly led to the creation of false Medicare and Medicaid claims.  Cade alleges she "observed that claims were being filed on patients that had not been seen by a physician," and that medical assistants "would be asked by Mr. Chambers to perform a lab review with the patient at the patient's home, and the claim for payment would be filed

3

under the Administrating Physician's name even though the physician had not seen the patient." (Am. Compl. ¶ 16-17). The Complaint does not allege any particular instance where this occurred. Cade further "observed a continuous request for patient's names to be used on Medical Necessity Forms to be submitted for payment," (id. ¶ 18), although she does not explain what this allegation means. She also alleges practices, without stating specific instances, of conducting medically unnecessary vascular studies, (id. ¶ 19), psychological assessments, (id. ¶ 20), pain management treatments, (id. ¶ 21), and new patient examinations, (id. ¶ 22). Relying on information and belief, Cade says that Chambers instructed others "to falsify or change codes in order to obtain Medicare and Medicaid reimbursement." (Id. ¶ 23).

The Complaint also states that many claims for lab tests were rejected for payment by Medicare and Medicaid. When this happened, Cade alleges, "Defendants' billers would simply change the diagnosis code . . . to some other code that appeared in the patient's billing history, . . . and resubmit the claim for payment." (Am. Compl. ¶ 24). According to Cade, "[t]he billers would not consult the physician or the patient's charts to determine whether the change was appropriate." (Id.).

Finally, Cade alleges that Defendants had a practice of using CPT codes for billing established-patient office visits to Medicare and Medicaid that are "unlikely" to be supported by the patient records.  (Am. Compl. ¶ 29).  When billing such a visit, one of five codes can be used, depending on the level of service involved with the visit.  (Id. ¶¶ 26-27).  Cade alleges that Defendants' administrative staff would "almost exclusively" use the second highest paying code and that when the Encounter Forms with these codes "were submitted to the billing department, the billers would not check the patient records to confirm that the code corresponded to the level of treatment provided."  (Id. ¶ 28).  In Cade's estimation, "the most common office visit codes should have been [the two lowest], and it is extremely unlikely that patient records would support the more frequent use of the higher codes by Defendants."  (Id. ¶ 29).

For all of her allegations, Cade states that she "is unable at this time to identify particular patients as to whom false claims were submitted, or the exact dates that such claims were submitted to Medicare and Medicaid, . . . because the documents necessary to identify such claims are in the exclusive possession of Defendants, and Relator does not have reasonable pre-discovery access to such documents."  (Am. Compl. ¶¶ 25, 32).

## II.   DISCUSSION

### A.   Legal Standard On A Motion To Dismiss

In a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiffs." Edwards v. Prime, Inc., 602 F.3d 1276, 1291 (11th Cir. 2010). Reasonable inferences are made in Plaintiff's favor, but "unwarranted deductions of fact in a complaint are not admitted as true." Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (internal quotation marks omitted). Similarly, the Court is not required to accept conclusory allegations and legal conclusions as true. See id. (citing Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 1951 (2009)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S. Ct. at 1949 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" are insufficient. Twombly, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556). This requires more than the "mere possibility the defendant acted unlawfully."

<u>Sinaltrainal</u>, 578 F.3d at 1261.  "The well-pled allegations must nudge the claim 'across the line from conceivable to plausible.'"  <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 570).

B.    <u>Application</u>

Cade claims that the improper billing practices alleged in the Complaint violated the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1) (2006),[3] and the Georgia False Medicaid Claims Act ("GFMCA"), Ga. Code Ann. § 49-4-168.1. (Am. Compl. ¶¶ 34, 39).

1.    *The False Claims Act And The Georgia False Medicaid Claims Act*

The FCA authorizes private plaintiffs, acting on behalf of the United States, to commence civil actions against and recover damages from "[a]ny person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1).  The GFMCA uses nearly identical language, imposing liability on any person who "[k]nowingly presents or causes to be

---

[3] Congress amended the FCA in 2009, but provided that the new Section (a)(1) would only apply to conduct occurring on or after the date of the amendments, on May 20, 2009.  Fraud Enforcement and Recovery Act, Pub. L. No. 111-21, § 4(f), 123 Stat. 1617, 1625 (2009).  The pre-2009 language therefore applies to this case.

presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval."  Ga. Code Ann. § 49-4-168.1(a)(1).

The schemes alleged in the Complaint relate to knowingly billing for medically unnecessary tests and other services, and billing tests or other services using the names of physicians that did not provide those services.  The schemes therefore involve alleged breaches of "a cardinal rule of federal health insurance reimbursement policy: providers are generally entitled to be paid for medical testing only when such testing (1) is medically necessary and/or (2) done at the direction of a patient's physician."  United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1303 (11th Cir. 2002), cert. denied, 537 U.S. 1105 (citing 42 U.S.C. §§ 1395f(a), 1395x(v)(4), & 1395y(a) (requirements for Medicare and Medicaid testing reimbursement)).

### 2.   *The Requirement To Plead Fraud With Particularity*

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  It is well-settled in the Eleventh Circuit that Rule 9(b) applies to claims brought pursuant to the FCA.  Clausen, 290 F.3d at 1308-09. Rule 9(b) applies to the FCA due to the statutory language creating liability for

"knowingly" submitting "false or fraudulent" claims to the United States, and because of the FCA's purpose as an anti-fraud statute. Id. at 1309. The language of the GFMCA is nearly identical to the FCA's language, so Clausen's reasoning applies and claims under the GFMCA also must satisfy Rule 9(b).

The particularity requirement serves the dual purposes of "alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." Id. at 1310 (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001)). To meet this requirement, "a plaintiff must plead facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." Id. (internal quotation marks omitted).

In Clausen, the Eleventh Circuit held that in FCA cases, the particularity requirement applies not only to the details of the false claim but to the submission or presentment of that claim to the United States. Calling the act of presentment "the *sine qua non* of a False Claims Act violation," Clausen stated that "[w]ithout the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act." Id.

9

at 1311.  Rule 9(b) therefore "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government."  Id.  Clausen concluded that "if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government."  Id. at 1311.

Clausen involved a series of schemes by a lab testing company to defraud Medicare and Medicaid by performing unnecessary tests.  The plaintiff attached to the complaint patient lists, patients' lab test results, and standing orders to perform unnecessary tests.  Despite these allegations, the Clausen court upheld the dismissal of the complaint because of the plaintiff's "failure to allege with any specificity if—or when—any actual improper claims were submitted to the Government."  Id. at 1312.  Clausen said that "nowhere in the blur of facts and documents assembled by Clausen regarding six alleged testing schemes can one find any allegation, stated with particularity, of a false claim actually being submitted to the Government."  Id.  The Complaint merely "set the stage for the consummation of this alleged nefarious plot," but "[did] not adequately allege when—or even if—the schemes were brought to fruition."  Id.  The allegation that

"these practices resulted in the submission of false claims for payment to the United States" was insufficient where no amounts of charges were indicated, no actual dates were identified, and no "policies about billing or even second-hand information about billing practices were described." Id.[4]

Following Clausen, the Eleventh Circuit has routinely upheld the dismissal of complaints with detailed allegations of fraudulent schemes that failed to allege with particularity the actual submission of false claims to the Government.  In United States ex rel. Atkins v. McInteer, for example, the plaintiff "described in detail . . . an elaborate scheme for defrauding the government by submitting false claims," and cited "particular patients, dates and corresponding medical records for services that . . . were not eligible for government reimbursement."  470 F.3d 1350, 1358-39 (11th Cir. 2006).  Yet Atkins upheld the dismissal of the complaint, because the plaintiff "fail[ed] to provide the next link in the FCA liability chain: showing that the defendants *actually submitted* reimbursement claims for the services he describes."  Id. at 1359.  The complaint "summarily concluded that the defendants submitted false claims to the government for reimbursement."  Id.  But the plaintiff "[did] not profess to have firsthand knowledge of the defendants'

---

[4] Clausen noted that these were not required factual allegations, only representative "of the types of information that might have helped Clausen state an essential element of his claim with particularity."  Id. at 1312 n.21.

submission of false claims," and his allegations were based only on rumors and his observations of "shoddy medical and business practices."  Id.

      *3.    How Rule 9(b)'s Pleading Standard Applies In This Case*

Cade alleges that the information necessary to allege the actual submission of a claim with particularity is exclusively within the possession of Defendants, (Am. Compl. ¶¶ 25, 32), and argues that this justifies the application of a more lenient pleading standard, (Resp. Mot. Dismiss 9-10).[5]  Other courts have announced such a principle, see, e.g., United States ex rel. Russell v. Epic Healthcare Mgmt. Group, 193 F.3d 304, 308 (5th Cir. 1999), abrogated on other grounds by United States ex rel. Eisenstein v. City of New York, 129 S. Ct. 2230 (2009), and Wright & Miller also encourages the approach, see 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1298 (3d ed. 2004) ("When the pleader is asserting that third persons have been defrauded, the pleader may lack sufficient information to be able to detail the claim at the outset of the action and less particularity should be required.").  The Eleventh Circuit, though, has never explicitly applied a lenient standard to an FCA claim in a published case.

---

[5] Although Cade's allegations that Defendants submitted false claims are not explicitly stated "upon information and belief," the inability to plead presentment with particularity, the lack of firsthand knowledge about the submission of claims, and Cade's limited role in the billing process support that Cade is implicitly pleading based on belief, and that her claims can survive, if at all, only to the extent that the Complaint provides the belief with some indicia of reliability.

Clausen was skeptical whether a more lenient standard was warranted, even though the plaintiff was a "corporate outsider" who had never worked for the defendant, because he "[was] not without avenues for obtaining information."  290 F.3d 1314 n.25 (citing Russell, 193 F.3d 304, 308 (5th Cir. 1999) (refusing to relax pleading standards because "the requisite information [was] possessed by other entities," such as the Government, and interpreting the FCA not to allow such relaxation)).[6]

In an unpublished case, however, the Eleventh Circuit said that "Rule 9(b)'s heightened pleading standard may be applied less stringently . . . when specific factual information about the fraud is peculiarly within the defendant's knowledge or control."  Hill v. Morehouse Med. Assocs., Inc., No. 02-14429, 2003 WL 22019936, at *4 (11th Cir. Aug. 15, 2003), reh'g & reh'g en banc denied, 87 F. App'x 716 (internal quotation marks omitted).  The plaintiff in Hill alleged several fraudulent schemes by the defendant to falsely bill Medicare for medical services. Id. at *2.  She "also alleged that she was aware that the false claims under these schemes were submitted to the government" but "could not identify patient names

---

[6] Clausen notes that the pleading requirement may be less stringent when the fraud is complex and long-running.  290 F.3d at 1314 n.25.  In such a case, plaintiffs must "allege some examples of actual false claims to lay a complete foundation for the rest of [their] allegations."  Id.  Cade does not assert that Rule 9(b) should be relaxed on the basis of the complexity of the fraud, nor could she, since she does not plead with particularity any examples of actual false claims that Defendants submitted to the Government.

nor the exact dates that the fraudulent claims were submitted to Medicare, because the confidential documents containing such information [were] in the exclusive possession of [the defendant]."  Id.

Hill held that the complaint stated a claim for relief, despite the absence of particular allegations that the defendants submitted the claims to the Government. Relaxing the application of Rule 9(b), the court held that the plaintiff's belief that the fraudulent claims were actually submitted to the government had the necessary "indicia of reliability" because the plaintiff "was an employee within the billing and coding department," "was privy to [the defendant's] files, computer systems, and internal billing practices that [were] vital to her legal theory," and "witnessed firsthand the alleged fraudulent submissions."  Id. at *4-5.

In United States ex rel. Walker v. R&F Properties of Lake County, Inc., the Eleventh Circuit applied the same reasoning but without expressly applying a relaxed Rule 9(b) pleading standard.  433 F.3d 1349, 1360 (11th Cir. 2005), reh'g & reh'g en banc denied, 179 F. App'x 687 (2006), cert. denied, 549 U.S. 1027.[7] The alleged scheme involved falsely billing nurse practitioner services as "incident

---

[7] Walker is somewhat unusual because the defendant prevailed on its motion for summary judgment, and when the plaintiff appealed the defendant cross-appealed the earlier denial of its motion to dismiss.  The defendant did not contest whether it had submitted the disputed claims to Medicare, only whether the claims were knowingly false.  Only after reversing the trial court's grant of summary judgment to the defendant did the Walker court turn to the defendant's motion to dismiss.

14

to the service of a physician," when the services were actually provided without physician involvement and should have been reimbursed at a lower rate.  Id.  The plaintiff pleaded that she "believed [the defendant] submitted false or fraudulent claims for services," but did not plead with particularity that the defendant had submitted any actual claim.  Id.  Walker held that the complaint satisfied Rule 9(b), and contrasted another case where the plaintiff failed to "explain why he believed fraudulent claims were ultimately submitted."  Id. (quoting Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005), reh'g & reh'g en banc denied, 167 F. App'x 170 (2006), cert. denied, 549 U.S. 810).  The plaintiff's allegations in Walker were "sufficient to explain why [she] believed" the claims had been submitted to Medicare, because she did not have a Medicare identification number—which was necessary to truthfully bill her services—and based on a particular conversation with the office administrator, who was specifically identified in the complaint and who had explained the defendant's policy of always fraudulently billing nurse practitioner services as incident to the services of a physician.

     In other recent cases, the Eleventh Circuit has followed—albeit with different results—the flexible approach of Hill and Walker, by focusing on whether the stated bases of a plaintiff's beliefs that false claims were submitted to

the Government provide the indicia of reliability required by Rule 9(b).  In

Corsello v. Lincare, Inc., 428 F.3d 1008, 1013 (11th Cir. 2005), the plaintiff argued

that his experience as a sales associate for the defendant allowed him to learn

details of the defendant's billing practices, providing the "indicia of reliability"

necessary to allege fraud with particularity.  Corsello held that the plaintiff's

position as a sales associate was not sufficient to support his conclusory allegations

that the defendant's fraudulent schemes "resulted in the submission of fraudulent

schemes."  Id.  According to Corsello, the plaintiff's beliefs that fraudulent claims

were submitted simply were not supported by underlying factual assertions.  Id. at

1013-14.

　　　Like Corsello, the plaintiff in Mitchell v. Beverly Enterprises, Inc., 248 F.

App'x 73, 75 (11th Cir. 2007) (unpublished), reh'g & reh'g en banc denied, 255 F.

App'x 504, included "specific allegations of [the defendant's] policies but

conclusory allegations that these policies "resulted in false charges being submitted

to Medicare."  The plaintiff alleged that he "observed and participated in a billing

process," and that "therapists would complete billing log forms, take the forms to

the administrator, and then have that information entered and sent directly to

Medicare without any edits from an outside source or other management official."

Id.  Mitchell held that the plaintiff's failure to identify any claims actually

submitted to the Government was fatal to his claim, despite his allegations that he observed and participated in the billing process, because he did not observe, participate in, or make allegations about the portion of the billing process where claims were actually sent to Medicare.  See id.

Finally, in United States ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1302-03 (11th Cir. 2010), the plaintiff claimed that the defendant submitted false claims to Medicare and that "she had gained personal knowledge of these billing practices through her employment as [the defendants'] office manager."  The Eleventh Circuit held that this was insufficient to satisfy Rule 9(b):

> Despite her assertion that she had direct knowledge of the defendants' billing and patient records, however, [the plaintiff] failed to provide any specific details regarding either the dates on or the frequency with which the defendants submitted false claims, the amounts of those claims, or the patients whose treatment served as the basis for the claims.  Without these or similar details, [the plaintiff's] complaint lacks the "indicia of reliability" necessary under Rule 9(b) to support her conclusory allegations of wrongdoing.  In other words, because she failed "to allege at least some examples of actual false claims," [the plaintiff] could not "lay a complete foundation for the rest of her allegations."

Id. at 1302 (internal citations omitted; quoting Clausen, 290 F.3d at 1314 n.25).

Although Mitchell and Sanchez reach the opposite results of Hill and Walker, they follow a similar methodology and support the conclusion that the Eleventh Circuit applies Rule 9(b) to FCA claims on a case-by-case basis to

determine if a plaintiff pleads "particular details of a scheme to submit false claims paired with reliable indicia that . . . claims were actually submitted." <u>United States ex rel. Grubbs v. Kanneganti</u>, 565 F.3d 180, 190 (5th Cir. 2009).[8]  The Court agrees with the Fifth Circuit's observation in <u>Grubbs</u>, that "the Eleventh Circuit itself has moved away from <u>Clausen</u>'s most exacting language, accepting less billing detail in a case where particular allegations of a scheme offered indicia of reliability that bills were presented," to determine if the Rule 9(b) pleading requirements are met.  <u>Id.</u> at 187 (citing and discussing <u>Walker</u>, 433 F.3d 1349).  Applying this standard, the question here is whether Cade's allegations about Defendants' billing process and her involvement in that billing process provide her belief that Defendants actually submitted false claims to the government with the indicia of reliability that Rule 9(b) requires.

---

[8] The Fifth Circuit said there should be a "strong inference that claims were actually submitted."  <u>Id.</u>  The Court interprets <u>Grubbs</u> to use the term "strong inference" in a casual sense to indicate that the allegations of fraud must be meaningfully and reliably supported, as Rule 9(b) requires.  "Strong inference," however, has additional meaning and application in the securities law context, so the Court consciously avoids using that language and also clarifies that it is not applying the "strong inference" test of <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 323 (2007).  Nothing in the Eleventh Circuit case law supports the consideration and competitive weighing of "plausible opposing inferences," <u>id.</u>, in the normal Rule 9(b) context.

4. *Cade's Allegations That Fraudulent Claims Were Submitted To The Government*

Cade relies on her experience as an assistance office manager, and her observations of the "process," (Am. Compl. ¶ 15), "practice," (id. ¶¶ 16, 19), or "procedure," (id. ¶ 22), used by the Defendants, to argue that her claims satisfy Rule 9(b). Even applying Rule 9(b) unrigidly to determine whether Cade's allegations about the billing process provide her claims of fraud with some indicia of reliability, the Court concludes that the Complaint must be dismissed.

Although Cade relies on her "observations" as an assistant office manager, her allegations that Defendants actually submitted false claims are general and conclusory. Cf. Clausen, 290 F.3d at 1314 n.25 (allegations based on belief must have factual basis and cannot rely on conclusory allegations). When it comes to the actual submission of claims, she relies on the passive voice—"claims were being filed," (Am. Compl. ¶ 16), "the claim for payment would be filed," (id. ¶ 17), "claims would be filed with Medicare or Medicaid," (id. ¶ 21)—and the person or persons actually submitting the claim remain a mystery. She cites "discussions with other individuals involved in the billing process," (id. ¶24), but unlike the plaintiff in Walker she does not identify with whom she spoke or otherwise provide details that would support the allegations. 433 F.3d at 1360. Nor does the Complaint ever differentiate between Medicare, Medicaid, and

private insurance, or explain the basis for Cade's belief that false claims were submitted to one versus the others.  This is not a case where additional specificity is unavailable to the Plaintiff.  See Russell, 193 F.3d at 308.

Cade seeks to rely on her role in the "billing process," like the plaintiff in Hill, whose position provided sufficient "indicia of reliability" that her extrapolated conclusions were credible.  In Hill, however, the plaintiff "was an employee within the billing and coding department and witnessed firsthand the alleged fraudulent submissions."  2003 WL 22019936, at *5.  In this case, Cade was an assistant office manager who performed, at most, a limited role in the billing process.  As an assistant office manager, Cade's duties were restricted to filling out the patient's demographic information on an Encounter Form, after which other staff members would indicate the procedure that was performed and the diagnosis that was obtained.  (Am. Compl. ¶ 15).  Later, the Encounter Form "was . . . faxed to a billing company known as MedSpecialists," (id.), and Cade would fax some claims to MedSpecialists, (id. ¶ 5), but the Complaint makes no effort to describe further steps in the billing process.  The Complaint does not allege who was responsible for actually submitting claims to any federal or state entity, nor does it describe MedSpecialist's role in reviewing and submitting claims on behalf of Defendants.

Cade does allege that she "would audit the claim submission, based upon a report received from the billing company, MedSpec, for resubmission to Medicare and Medicaid." (Am. Compl. ¶ 15). The allegation is interesting and confusing. On one hand, it attempts to impart some unique role for Cade in the billing process, some special responsibility to "audit" claim submissions. But this suggestion of knowledge is not corroborated or contextualized by any allegations in the Complaint that would provide Cade's claims of fraud with any indicia of reliability. Cade does not say what information was in the reports received from MedSpecialists, what exposure she had to that information during her "audit," or what she did during her audits that caused her to learn whether false claims were actually submitted, to whom they were submitted, and on what basis, if any, they were false.

On the other hand, Cade's allegations logically support, when read in the context of the Complaint as a whole, that an independent entity was responsible for billing Medicare and Medicaid. That its role is not described discredits Cade's argument that she has provided sufficient indicia of reliability for her claims that fraudulent claims were in fact submitted. There is a complete absence of any explanation of MedSpecialists role in the submission process, how MedSpecialists submitted claims, or to whom it submitted them, as Cade alleged. It is unclear to

what extent MedSpecialists may even have independently reviewed claims or checked them for regularity and accuracy, or whether it took some remedial action to address claims it may have determined were not accurate or complete. What is clear is that to the extent Cade claims to have some knowledge of the claims process in her assistant office manager function, she fails to offer knowledge of the critical process of actually submitting claims to Medicare or Medicaid. The absence of facts about this submission step is alone sufficient to find that Cade has not met the Rule 9(b) pleading requirements.

Unlike Hill, where the plaintiff had detailed knowledge of the billing process and witnessed firsthand the submission of fraudulent claims, Cade has given a superficial, haphazard, and contradictory description of the billing process that is insufficient to provide the indicia of reliability necessary to state a claim for fraud. Cade never "witnessed firsthand the alleged fraudulent submissions," Hill, 2003 WL 22019936, at *5, and nothing in the Complaint indicates with any reliability that she would even know whether or not Defendants submitted any such claims.

This case is remarkably similar to Mitchell, where the relator "observed and participated in a billing process," but "provided specific facts only about the therapists' billing logs, not the actual claims presented to Medicare." 248 F. App'x at 75. Just as Cade alleges that that fraudulent Encounter Forms were provided to

MedSpecialists, the plaintiff in <u>Mitchell</u> alleged that fraudulent billing logs were given to an administrator who would send the information directly to Medicare. <u>Id.</u>  Cade similarly fails to allege "specific facts as to who submitted the bills to Medicare, how they were submitted, or when they were submitted."  <u>Id.</u>  Like in <u>Mitchell</u>, Cade here fails to plead facts sufficient to meet Rule 9(b)'s pleading standard.  <u>See also Sanchez</u>, 596 F.3d at 1302-03 (plaintiff's allegations that she had personal knowledge of defendant's billing practices because of her position as office manager did not provide sufficient indicia of reliability under Rule 9(b)).

Plaintiff's counsel argues that Cade "was the closest thing Defendants had to a billing department," (Resp. Mot. Dismiss 6), but that representation is not supported by the Complaint.  The Complaint states that another employee "provided billing services for FCHC and PCHC."  (Am. Compl. ¶ 7).  When she alleges specific fraudulent schemes, Cade says that "Defendants' billers would simply change the diagnosis code," that the "billers would not consult the physician or the patient's charts," (<u>id.</u> ¶ 24), and that "the billers would not check the patient records," (<u>id.</u> ¶ 29).  She also refers to the Defendants' "billing department."  (<u>Id.</u>).[9]  While merely outsourcing billing processes would not

---

[9] These and other contradictory allegations, along with the non-sequential and repetitive paragraph numbering (for example, there are three paragraphs numbered eleven), suggest that perhaps generic allegations of wrongdoing have been

immunize a healthcare provider from FCA liability, the Complaint's confusion over the existence of a billing department and failure to explain how Cade's role in the billing process exposed her to the information that would allow her to reliably assert that "claims were submitted" to Medicare and Medicaid are fatal to ther claims against PCHC and Chambers.

The vague, obscure nature of Cade's allegations of the billing process, and her extremely limited involvement in the process, are insufficient to provide her allegations with the indicia of reliability required by Rule 9(b).

5.    *Cade's Allegations Of Fraudulent Schemes*

Under <u>Clausen</u>, Cade's failure to provide the necessary indicia of reliability for her allegations that false claims were actually submitted to the government requires the dismissal of her case.  Cade's claims relating to the alleged underlying schemes, however, warrant a brief discussion.  The Complaint consists of many undeveloped accusations of conduct, some of which is also alleged to be wrongful. It appears that the strategy was to simply try a lot of claims and hope that enough stuck to satisfy the federal pleading standards.  It is perhaps the case that a few of the claims of underlying fraudulent conduct satisfy Rules 8(a) and 9(b).  But many of the claims are too vague and incomplete to allege fraud with particularity, or to

sprinkled into the Complaint without regard to the particular circumstances of this case.  This does not bolster the reliability of Cade's allegations of fraud.

provide adequate notice to the Defendants of the wrongful conduct of which they are accused.

For example, Cade alleges that "[b]ased on her personal observations while working for Defendants, Relator estimates that codes were changed or falsified in this manner at least 25-30 times a week." (Am. Compl. ¶ 23). There is no indication in the Complaint of what is meant by "this manner." The context of the allegation does not clarify the meaning, and the paragraphs nearby the allegation do not specify the manner in which the allegedly wrongful conduct took place. It is unclear if Cade intended this as a separate underlying fraudulent scheme or as part of another scheme. The allegation, however, is not related to the schemes alleged immediately before and afterward. At best, the claim appears to be a drafting error. At worst, it appears to be an unsuccessful attempt to gloss over a lack of familiarity with the particular circumstances of the allegedly fraudulent conduct. The allegation does not make sense and is insufficient to put Defendants on notice of the accusations against them.

In a similar example, the Complaint states that "Relator also observed a continuous request for patient's names to be used on Medical Necessity Forms to be submitted for payment. The names were names of patients who never came to the office for services but were still assigned to FCHC or PCHC as the primary

provider for their medical care." (Am. Compl. ¶ 18). The Complaint does not specify who was making the continuous request, or for what services the medical necessity forms were being filled out. Cade does not even allege that the forms were false. This is particularly troubling where other allegations in the Complaint make clear that services were performed in patient homes as well as in Defendants' offices. (E.g., id. ¶ 17).

Other allegations describe conduct but stop short of showing that the conduct is wrongful. One scheme is described, at most, as a "questionable procedure." (Am. Compl. ¶ 22). Another claim alleges that when lab tests were billed with diagnosis codes that indicate that only a routine medical examination took place, office staff would change the diagnosis code to one for which Medicare and Medicaid support reimbursement for lab tests. (Id. ¶ 24). There is no allegation or suggestion, however, that the updated codes were inaccurate or false. A later claim refers to the billing codes used for established-patient office visits, but only suggests that many are "unlikely to be supported by the patient records." (Id. ¶¶ 29, 31). These allegations suggest that Cade has certain suspicions that fraudulent conduct may be uncovered if she is allowed access to Defendants' files during discovery, but that currently she has little, and maybe no, basis to believe that wrongful acts occurred. These allegations, which are "merely consistent with

26

liability," Twombly, 550 U.S. at 557, do not meet the requirements of Rule 8(a), much less the more demanding requirements of Rule 9(b).

It is not necessary in this case, however, to scour the Complaint and determine whether any of the allegations amount to a claim of fraudulent conduct that is alleged with plausibility and particularity.  The failure to include adequate indicia of reliability to support the allegations that actual fraudulent submissions were submitted to the government, as Clausen requires, is alone sufficient to dismiss the Complaint against Chambers and PCHC.  It suffices to say that the allegations of the underlying fraudulent schemes provide further confirmation that Cade lacks the requisite experience with and knowledge of Defendants' billing policies to plead with the particularity that Rule 9(b) demands.[10]

---

[10] Cade is represented by counsel, has already amended the Complaint once, was on notice that the heightened requirements of Rule 9(b) would be applied to the Complaint, and has not moved to amend the Complaint.  Moreover, the underdeveloped nature both of the allegations that claims were actually submitted to the government and of the allegations of the underlying schemes indicates that Cade simply lacks the personal knowledge to plead her case with the particularity required for fraud claims.  The dismissal of the claims against Chambers and PCHC is therefore with prejudice.  Sanchez, 596 F.3d at 1303 ("'A district court is not required to grant a plaintiff leave to amend [her] complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend or requested leave to amend before the district court,'" quoting Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 542 (11th Cir. 2002) (en banc)).

C.      The Requirement To Serve The Remaining Defendants

Federal Rule of Civil Procedure 4(m) requires a plaintiff to serve all defendants within 120 days of filing the complaint.  If a defendant is not served within that time, the Court is required to dismiss the claim against that defendant or order that service be made within a specified time, unless the plaintiff can show good cause for the failure.  The Complaint was unsealed over nine months ago, and the docket indicates that FCHC and the four individual defendants have not been served with process.  Cade is therefore ordered to show cause on or before July 29, 2011, why the remaining defendants should not be dismissed for failure to timely serve them as required by Rule 4(m).  A failure to demonstrate good cause will result in the dismissal of the remaining defendants.

## III.     CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [15] is **GRANTED**.  Defendants James Chambers and Progressive Community Healthcare, Inc. are **DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiff/Relator Toxi E. Cade is ordered to **SHOW CAUSE** on or before July 29, 2011, why the remaining

defendants should not be dismissed pursuant to Federal Rule of Civil Procedure 4(m) for failure to serve process within 120 days of the Complaint.

**SO ORDERED** this 14th day of July, 2011.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE